UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
LAWRENCE CLAIRMONT,             :
                                 :     Case No.:
           Plaintiff,       :
                                 :     **COMPLAINT**
    -against-            :
                                 :     **DEMAND FOR JURY TRIAL**
THE KEYW HOLDING CORPORATION,  :
WILLIAM J. WEBER, CAROLINE PISANO,  :
DEBORAH BONANNI, BILL CAMPBELL,  :
SHEP HILL, CHRIS INGLIS, KEN       :
MINIHAN, ART MONEY and MARK SOPP,  :
                                 :
           Defendants.    :
                                 :
                                 :
------------------------------------- X

Plaintiff Lawrence Clairmont ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against the KeyW Holding Corporation ("KeyW" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with KeyW, the "Defendants") for their violations of Sections 14(d)(4) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), respectively, and United States Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9 ("Rule 14d-9"). Plaintiff's claims arise in connection with the proposed tender offer ("Tender Offer") by Jacobs Engineering Group, Inc., through its subsidiaries (collectively "Jacobs"), to acquire all of the

issued and outstanding shares of KeyW (the "Proposed Transaction").

2.      On April 22, 2019, KeyW entered into an agreement and plan of merger (the "Merger Agreement"), whereby shareholders of KeyW common stock will receive $11.25 in cash for each share of KeyW stock they own (the "Offer Price").

3.      On May 13, 2019, in order to convince KeyW's stockholders to tender their shares, the Board authorized the filing of a materially incomplete and misleading Schedule 14D-9 Solicitation/Recommendation Statement (the "Recommendation Statement") with the Securities and Exchange Commission ("SEC"). In particular, the Recommendation Statement contains materially incomplete and misleading information concerning: (i) the sales process; (ii) the data and inputs underlying the financial valuation performed by the Company's financial advisor, Guggenheim Securities, LLC ("Guggenheim Securities"); and (iii) certain financial projections prepared by KeyW and relied upon by Guggenheim Securities.

4.      The Tender Offer is scheduled to expire at one minute after 11:59 p.m. (12:00 midnight), New York City time, on May 23, 2019 (the "Expiration Date"). It is imperative that the material information that has been omitted from the Recommendation Statement is disclosed to the Company's shareholders prior to the forthcoming Expiration Date so they may make an informed determination on whether to tender their shares.

5.      For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from closing the Tender Offer or taking any steps to consummate the Proposed Transaction, unless and until the material information discussed below is disclosed to KeyW's shareholders or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391 as Plaintiff alleges violations of Sections 14(d)(4) and 14(e) of the Exchange Act.

7.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id*. at 1316.

8.      Venue is proper in this Court under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, KeyW's common stock trades on the Nasdaq stock exchange, which is headquartered in this District, rendering venue in this District appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

9.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of KeyW's common stock.

10.     Defendant KeyW's is a Maryland corporation and maintains its principal executive

office at 7740 Milestone Parkway, Suite 400, Hanover, Maryland 21076. KeyW is an owner, developer and manager of collegiate housing; additionally, KeyW is a "leader in intelligence, cyber and mission IT and analytics in the intelligence and national security communities." The Company's common stock trades on the Nasdaq under the ticker symbol "KEYW".

11. Individual Defendant William J. Weber ("Weber") is and has been President and Chief Executive Officer and a director of KeyW since October 1, 2015.

12. Individual Defendant Caroline Pisano ("Pisano") is and has been a director of KeyW since August 22, 2008 and Chairwoman of the Board since May 2015.

13. Individual Defendant Deborah Bonanni ("Bonanni") is and has been a director of KeyW since April 1, 2013.

14. Individual Defendant Bill Campbell ("Campbell") is and has been a director of KeyW since July 16, 2009.

15. Individual Defendant Shep Hill ("Hill") is and has been a director of KeyW since November 9, 2016.

16. Individual Defendant Chris Inglis ("Inglis") is and has been a director of KeyW since May 18, 2016.

17. Individual Defendant Ken Minihan (Lt. General (Ret.) USAF)("Minihan") is and has been a director of KeyW since August 22, 2008.

18. Individual Defendant Art Money ("Money") is and has been a director of KeyW since August 22, 2008.

19. Individual Defendant Mark Sopp ("Sopp") is and has been a director of KeyW since March 16, 2016.

20. The defendants identified in paragraphs 11-19 are collectively referred to as the

"Individual Defendants" or the "Board," collectively with KeyW as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.  Background and the Unfair Offer Consideration

21.     KeyW was founded in 2008 by Leonard Moodispaw, a former National Security Agency senior manager who stepped down as CEO in 2015 and was replaced by Individual Defendant Weber in October 2015.   Individual Defendant Weber sought to return KeyW's business focus to government clients, while emphasizing growth and business development. Individual Defendant Weber also wanted to double KeyW's revenues to top $500 million. This goal was achieved in 2017 when KeyW purchased Sotera Defense Solutions ("Sotera") in April 2017 to create a combined company with about 2,100 employees and $535 million in revenue.

22.     KeyW's growth since its purchase of Sotera has been exemplary.  As noted by Individual Defendant Weber on November 6, 2018, commenting on KeyW's 2018 third quarter results:

> "KeyW continued to execute our plan, delivering strong revenue, profitability, cash flow and contract awards.  We exceeded our revenue, profitability and awards objectives for the quarter, paid down $10 million of debt and are well-positioned to close the year with solid momentum heading into 2019.  We are winning new work across all our core focus areas, the spending environment remains strong and our pipeline provides significant growth opportunities," said Bill Weber, KeyW's president and chief executive officer.

23.     KeyW's strong performance continued throughout 2019.  On March 12, 2019, KeyW released its 2018 fourth quarter and year end results, with Individual Defendant Weber commenting:

> "We had a successful fourth quarter as we recorded revenue that was consistent with our full-year guidance, delivered adjusted EBITDA that exceeded expectations and paid down additional debt," said Bill Weber, KeyW's president and chief executive officer. "We are successfully executing our strategy to generate attractive prime contract awards, protect our base and deliver advanced solutions for our customers in the areas of ISR, Cyber, and Analytics. We entered 2019 with strong fundamentals in place –a high-quality pipeline, a robust federal spending environment and a talented team positioned to drive growth and increase

shareholder value."

24.     Therefore, the Proposed Transaction comes at a time when KeyW's recent and future success was not fully reflected by its share price. The Proposed Transaction will cash-out KeyW stockholders at a price that fails to adequately compensate them for the intrinsic value of their shares.

25.     Despite KeyW's intrinsic value and growth prospects, the Individual Defendants are agreeing to sell the Company and deprived its stockholders of the ability to partake in the Company's future growth.  The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Offer Consideration, and by allowing the unfair and flawed sales process to unfold in the manner that it did, which has caused Plaintiff and the Class to receive an inadequate Offer Consideration.

26.     Indeed, without any public announcement, KeyW engaged Guggenheim Securities as financial advisor to assist the Company in evaluating certain potential strategic alternatives available to the Company, and entered into a formal engagement with Guggenheim Securities on August 3, 2018.  On October 31, 2018, in connection with its continuing review of strategic alternatives, without any public announcement, the Company also engaged Weil, Gotshal & Manges LLP ("Weil") as legal counsel to assist that process.  Between October 2018 through early February 2019, senior management of the Company, including Individual Defendant Weber, met with three potential strategic partners, including a Company A, which is a strategic company within the industry, to engage in capabilities briefings and provide an overview of the Company's business and future opportunities based on publicly available information.

27.     On January 29, 2019, a representative of Guggenheim Securities, contacted Jacobs to arrange a meeting to discuss the Company's business.

28.     On February 9, 2019, Company A made a non-binding indication of interest proposing to acquire the Company for cash consideration at a price per share ranging from $9.00 to $11.00.  Company A also requested a 30-day exclusivity period to complete its due diligence and negotiate and finalize documents.

29.     On February 11, 2019, the Company created a strategic alternatives committee comprised of Caroline Pisano, Arthur Money and Shepherd Hill.

30.     On February 12, 2019, the Company informed Company A that Company A's proposal was attractive enough to permit diligence, but that the Company would not enter into an exclusivity period.

31.     That same day, on February 12, 2019, Guggenheim Securities informed Jacobs of Company A's proposal, and on February 14, 2019 the Company and Jacobs entered into a confidentiality agreement, which included a customary standstill.

32.     By February 15, 2019, Guggenheim Securities had contacted eight potential strategic acquirers (in addition to Company A), including Jacobs, and planned to contact two potential financial buyers.

33.     That same day, on February 15, 2019, the Company entered into a confidentiality agreement with Company B, which included a customary standstill.

34.     Finally, on February 19, 2019, the Company entered into a confidentiality agreement with Company A, which also included a customary standstill.

35.     Thereafter, during February and March 2019, senior management of the Company and Guggenheim Securities met with representatives of various interested parties, including Company A and Jacobs, and provided a management presentation about the Company, following which the Company shared its five-year stand-alone projections with the interested parties.

36.     In addition to these meetings, the Company held four further meetings exclusively with Jacobs.  At the first, on March 6, 2019, the Company made presentations regarding sector review, potential cross-selling opportunities and business development activities to Jacob's due diligence team and representatives of Barclays Capital Inc. Jacob's financial advisor.  In the second meeting, on March 8, 2019, Jacob's due diligence team engaged in further discussions with representatives of the Company on their overhead and potential cost synergies.  At the third meeting, on March 13, 2019, representatives of Jacob's management met with representatives of the Company's management to have a classified review of existing products and opportunities related to the Company's Intelligence, Surveillance and Reconnaissance business.  Finally, also on March 13, 2019, Steve Demetriou, Jacob's Chair, Chief Executive Officer and President, and Individual Defendant Weber met in New York and had a high-level discussion regarding Jacob's and the Company's businesses.

37.     Without the benefit of any additional meetings and confidential and non-public information that had been shared with Jacobs, on March 13, 2019, Company A submitted a revised, non-binding indication of interest to acquire the Company for $11.00 per share for all cash consideration. Company A also requested exclusivity through March 31, 2019 and noted that definitive transaction documentation could be finalized by that date.

38.      On the following day, March 14, 2019, the Board noted that Company A's $11.00 per share offer was a reasonable starting point for negotiations, but that the Board would be in a better position to evaluate the offer once Jacob's bid was received.

39.     On March 15, 2019, Jacob's submitted a preliminary, non-binding indication of interest to acquire the Company, for all cash consideration in a range of $10.25 to $10.75 per share. Jacob's also requested a 30-day exclusivity period to complete its due diligence.

40.     Thereafter, for the remainder of March 2019 and the first three weeks of April 2019, the Company continued negotiations with Company A and Jacobs, with both Company A and Jacobs submitting bids at $11.25 per share.

**B.     The Proposed Transaction**

41.     On April 22, 2019, Jacobs and KeyW jointly announced the Proposed Transaction. The press release stated as follows:

> The KeyW Holding Corporation (NASDAQ:KEYW) announced today that it has signed a definitive agreement and plan of merger (the "Merger Agreement") with Jacobs (NYSE: JEC) and Atom Acquisition Sub, Inc., a newly created wholly owned indirect subsidiary of Jacobs ("Merger Sub"), to be acquired by Jacobs for $11.25 per share in cash. The transaction has an enterprise value, net of tax assets, of approximately $815 million, including an estimated $272 million of KeyW net debt. The merger consideration represents a premium of 43% to KeyW's closing stock price on April 18, 2019. KeyW is a leader in intelligence, cyber and mission IT and analytics in the intelligence and national security communities.
>
> Pursuant to the terms of the Merger Agreement, Merger Sub will conduct an all-cash tender offer for 100% of KeyW's common stock (the "Offer") and, subject to the successful completion of the Offer, Merger Sub will merge with and into KeyW (the "Merger") resulting in KeyW becoming a wholly owned indirect subsidiary of Jacobs. The Merger Agreement was unanimously approved by the members of each company's Board of Directors voting on the transaction.
>
> Under the terms of the Merger Agreement, Jacobs will commence the Offer as promptly as practicable. Any shares of KeyW common stock not tendered in the Offer will be acquired by Jacobs in the Merger and the holders thereof will be entitled to receive the per share merger consideration. The KeyW Board intends to recommend that KeyW shareholders tender their shares to Jacobs in the Offer.
>
> "This transaction will propel KeyW's capabilities further and create new opportunities for research and development our customers need to enhance their national security and intelligence capabilities," said KeyW CEO and president Bill Weber. "With the currently strong federal funding scenario and KeyW's solid reputation in ISR, Cyber and Analytics services technologies, I believe combining with Jacobs will provide our customers a wide array of capabilities and services via a broad range of contracting vehicles."
>
> "Cultural fit and exceptional shareholder value were of paramount importance in the selection criteria for partnership in KeyW's next chapter," said Weber. "We believe

that joining with Jacobs will enable KeyW's talented team to deliver even more innovative technologies and capabilities to customers."

Jacobs leads the global professional services sector delivering solutions for a more connected, sustainable world. With $15 billion in fiscal 2018 revenue and a talent force of more than 80,000, Jacobs provides a full spectrum of services including scientific, technical, professional and construction- and program-management for business, industrial, commercial, government and infrastructure sectors.

"Jacobs' global reach and proven track record executing large complex enterprise contracts provide a powerful platform to unleash KeyW's complementary rapid technology development," said Jacobs Chair and CEO Steve Demetriou. "We are positioned to further accelerate KeyW's success in leveraging its unique technical solutions and drive value creation for shareholders and customers alike, including a multi-billion-dollar space opportunity delivering next generation intelligence and analytics solutions. Given the compelling fit of Jacobs' capabilities and contract execution expertise with KeyW's differentiated, mission driven technology, we are optimistic that we can drive strong double-digit adjusted EBITDA growth well into the future."

The closing of the transaction is subject to KeyW shareholders validly tendering more than 50% of the outstanding shares of KeyW common stock prior to the expiration of the Offer. Following the successful closing of the Offer, Jacobs will acquire any remaining shares of KeyW common stock not tendered in the Offer through a second-step merger at the same per share merger consideration. The closing of the transaction is also subject to customary closing conditions and approvals, including receipt of regulatory approval and is expected to be completed by August 31, 2019.

Guggenheim Securities, LLC served as the exclusive financial advisor to KeyW. Weil, Gotshal & Manges LLP served as external legal counsel to KeyW. Fried, Frank, Harris, Shriver & Jacobson LLP is serving as external legal counsel to Jacobs and Barclays is serving as its exclusive financial advisor.

42. Rather than continuing to build upon KeyW's improving prospects, the Offer Consideration being offered to KeyW's public stockholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of KeyW common stock is materially in excess of the amount offered given the Company's recent financial performance and its prospects for future growth and earnings.

**C.**     **The Preclusive Deal Protection Devices**

43.     To the detriment of KeyW stockholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

44.     Section 5.2 of the Merger Agreement is a restrictive no-shop provision that prohibits the members of the Board from soliciting proposals relating to alternative offers or business combinations.

45.     The Merger Agreement also includes a strict "standstill" provision which prohibits, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations.

46.     Section 5.2(c) of the Merger Agreement requires the Board to provide Jacobs with written notice of any Acquisition Proposal within twenty-four (24) hours of its receipt.  Further, the Board must provide prior written notice within four (4) business days of its intention to terminate the Merger Agreement in favor of any Superior Proposal and negotiate with Jacobs following Jacobs's receipt of the notice, so that Jacobs has the opportunity within four (4) business day to adjust the terms and conditions of the Merger Agreement so that the Company Acquisition Proposal ceases to be a Superior Proposal.

47.     In addition, the Merger Agreement provides that the Company will be required to pay to Parent a termination fee of $21 million to Parent with respect to any termination

48.     Ultimately, these preclusive deal protection devices restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a

significant interest in the Company. The aggregate effect of these preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for KeyW shares in the Proposed Transaction, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

49.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**D.      The Recommendation Statement Omits Certain Material Information**

**(i)      The Recommendation Statement Contains Materially False Statements and Omissions Regarding the Process by Which the Board Agreed to Sell the Company**

50.     Page 18 of the Recommendation Statement states:

During the period from October 2018 through early February 2019, William J. Weber, President and Chief Executive Officer of the Company, Michael Alber, Chief Financial Officer of the Company, John Sutton, Chief Operating Officer of the Company, Kirk Herdman and other members of senior management of the Company met with three potential strategic partners, including Company A, to engage in capabilities briefings and provide an overview of the Company's business and future opportunities based on publicly available information. Senior management periodically updated members of the Company's board of directors on the status of these discussions.

The Recommendation Statement fails to disclose the identity and/or composition of the members of KeyW's board of directors, if any, with whom senior management of the Company consulted during the period from October 2018 through early February 2019.   The Recommendation Statement also fails to disclose whether KeyW contacted "three potential strategic partners, including Company A" or whether KeyW was contacted by these "three potential strategic partners." This information is material to stockholders considering whether to tender their stock in

the Offer because it is important in assessing whether and the degree to which the Board was involved or apprised of these early contacts between KeyW and potential buyers.

51.     Page 18 of the Recommendation Statement states:

On October 31, 2018, in connection with its continuing review of strategic alternatives, the Company engaged Weil, Gotshal & Manges LLP ("*Weil*") as legal counsel to assist that process. The decision was based on the qualifications of Weil including its deep experience in advising public companies through the evaluation of strategic alternatives.

The Recommendation Statement fails to disclose whether the Board was involved in the engagement of Weil and is important to KeyW stockholder considering whether to tender their stock in the Offer because it is important in assessing whether and the degree to which the Board was involved or apprised of the engagement of Weil.

52.     Pages 21, 22 and 23 of the Recommendation Statement states:

On March 6, 2019, Parent's due diligence team and representatives of Barclays Capital Inc. ("*Barclays*"), Parent's financial advisor, attended follow-up presentations with the Company's management in Washington, D.C., which centered on sector review, potential cross-selling opportunities and business development activities.

On March 8, 2019, Parent's due diligence team engaged in further discussions with representatives of the Company on their overhead and potential cost synergies.

[…]

On March 13, 2019, representatives of Parent's management met with representatives of the Company's management to have a classified review of existing products and opportunities related to the Company's Intelligence, Surveillance and Reconnaissance business.

Also on March 13, 2019, Mr. Steve Demetriou, Parent's Chair, Chief Executive Officer and President, and Mr. Weber met in New York and had a high-level discussion regarding Parent's and the Company's businesses.

[…]

Also on March 21, 2019, Mr. Demetriou and Mr. Kevin Berryman, Parent's Chief Financial Officer, met with Mr. Weber and Ms. Pisano to continue a dialogue about a potential strategic transaction involving Parent and the Company.

The Recommendation Statement fails to disclose whether and the extent to which the Board was apprised of and why the KeyW senior management singled out Jacobs for these additional meetings, consultations and discussions without extending the same consideration to any of the other bidders, including Company A. This information is important to stockholders in determining whether senior management's favorable treatment of Jacobs was based on determinations of the best interests of stockholder.

53.     Page 24 of the Recommendation Statement states:

On April 1, 2019, counsel to Company A submitted a markup of the merger agreement to Weil. From April 1, 2019 through April 5, 2019, Weil had a number of discussions with members of the Company's management team to discuss points raised in Company A's comments to the draft merger agreement. In particular, Weil noted the following areas of discussion: (i) Company A's request that the Company's four sector vice presidents and substantially all of their direct reports were required to enter into retention agreements with Company A as a condition to signing; (ii) proposed revisions to the treatment of equity awards; (iii) modifications to the tender offer process and timeline; (iv) increased limitations on the conduct of business between signing the merger agreement and closing; (v) the scope of Company's A's undertaking to obtain regulatory approvals and employee related matters; (vi) increased restrictions on the Company's non-solicitation obligations; and (vii) Company A's proposed termination fee equal to 4.5% of the Company's equity value.

The Recommendation Statement fails to disclose the terms and conditions of the proposed retention agreements with KeyW's four sector vice presidents and the terms and conditions of the proposed revisions to the treatment of KeyW's equity awards. This information is material to stockholders considering whether to tender their stock in the Offer because it is important in assessing whether senior management of KeyW viewed the proposed retention agreements and proposed revisions to the treatment of equity awards as important to senior management's assessment of Company A's proposed bid as compared to Jacob's bid.

54.     Page 25 of the Recommendation Statement states:

> On April 4, 2019, representatives of Parent's management team and certain members of the Parent's board of directors met with members of the Board of Directors and the Company's senior management in Herndon, Virginia, during which they discussed the potential acquisition of the Company by Parent and the benefits and capabilities that the Company could bring to Parent.

The Recommendation Statement fails to disclose whether "benefits and capabilities that Company could bring to Parent" were unique to a transaction with Jacobs or whether these "benefits and capabilities" were also applicable to the other potential bidders, including Company A. This information is material to stockholders considering whether to tender their stock in the Offer because it is important in assessing whether senior management of KeyW favored a transaction with Jacobs over potential transactions with other potential bidders, including Company A.

55.     Page 26 of the Recommendation Statement states:

> On April 13, 2019, Mr. Demetriou and Mr. Weber had a telephonic meeting to discuss the status of the transaction process, including certain open due diligence items and the expected timing of Parent's offer later that week. Additionally, Mr. Demetriou and Mr. Weber discussed certain material terms of the Merger Agreement, including the treatment of KeyW's equity awards, employee matters and the size of the termination fee.

The Recommendation Statement fails to disclose the details of the negotiations between Demetriou and Individual Defendant Weber with respect to "the treatment of KeyW's equity awards" in connection with the Proposed Transaction. This information is material to stockholders considering whether to tender their stock in the Offer because it is important in assessing whether senior management of KeyW was motivated to enter into a transaction with Jacobs rather than other potential bidders, including Company A, based on Jacobs willingness to provide favorable treatment to KeyW's equity awards in the Proposed Transaction.

(ii)     **The Recommendation Statement Contains False Statements and Omissions Related to Guggenheim Securities' Fairness Opinion**

56.     The Proxy Statement describes Guggenheim Securities' Fairness Opinion and the various valuation analyses Guggenheim Securities performed to render its opinion. However, the description fails to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions. Without this information, one cannot replicate the analyses, confirm the valuations, evaluate Guggenheim Securities' opinion that the consideration offered to KeyW shareholders in the Proposed Transaction is fair, or accurately assess the reliability of the Fairness Opinion.  The informative value of the Fairness Opinion is not in its conclusion, but in the valuation analyses that support that result. These key inputs used to arrive at those conclusions, must also be fairly disclosed.

57.     With respect to the *Selected Companies Analysis* on Page 43, the Recommendation Statement fails to disclose the basis for Guggenheim Securities' selected range of multiples for the selected companies and why Guggenheim Securities selected these ranges.  The Recommendation Statement also fails to disclose the EBITDA and P/E multiples of the selected companies.

58.     This information is important for shareholders evaluating the basis and rationale for Guggenheim Securities' selection of the selected companies because KeyW has previously identified *many more* companies in its peer group.

59.     With respect to Guggenheim Securities' potential conflicts of interest, the Recommendation Statement fails to disclose (i) the compensation paid to Guggenheim for their work on the Proposed Transaction, and (ii) the timing, nature and amount of compensation paid to Guggenheim for previous work rendered to KeyW.

60.     This information is important for shareholders because potential conflicts of interest could interfere with the investment banker's capacity to fairly evaluate the financial information and to make financial projections for the company being evaluated.

61.     With respect to Guggenheim Securities' *Premia Analysis*  on Page 44, the Recommendation Statement  fails to disclose (i) the transactions observed by Guggenheim in their analysis and (ii) the amount paid to Guggenheim for the premiums related to those transactions.

62.     This information is important for shareholders because the aforementioned financial information is material; it gives shareholders the ability to project the financial performance of the company being evaluated.

63.     With respect to Guggenheim Securities' *Discounted Price Targets* on Page 44, the Recommendation Statement fails to disclose (i) price targets for KeyW's common stock, (ii) the sources used in order to compute said price targets, and (iii) the inputs and assumptions underlying the discount rate used.

64.     With respect to the *Discounted Cash Flow* Analysis on Pages 39 and 40, the Recommendation Statement fails to disclose the rationale and basis for (i) applying a selected range of terminal forward multiples and (ii) using a selected range of discount rates, (iii) how stock-based compensation was treated in the analysis (i.e. cash or non-cash expense); (iv) the range of implied perpetuity growth rates derived in the analysis; and (v) the value of the Company's NOLs accounted for in this analysis, if at all; (vi) a full sensitivity table for the entire range of discount rates and growth rates; (vii) all line items necessary to calculate Unlevered Free Cash Flow; and, (viii) KeyW's terminal and computing values.

65.     The Proxy Statement also fails to provide the financial projections provided by KeyW's management and relied upon by Guggenheim Securities for purposes of its analysis, for

fiscal years 2019-2024, for the following items: (i) Adjusted D&A, (ii) Taxes (or tax rate), (iii) Stock-based compensation expense, (iv) Changes in net working capital, (v) Capital expenditures, (vi) Any other line items used in the calculation of unlevered free cash flow, (vii) Unlevered free cash flow; (viii) all line items necessary to compute Management Defined Adjusted EBITDA; (ix) all line items necessary to compute Adjusted EBITDA; and, (x) a reconciliation of all Non-GAAP and GAAP metrics.

66.     This information, with respect to *Discounted Price Targets*, *Discounted Cash Flow* and financial projections, is important for shareholders because the aforementioned financial information is material; it gives shareholders the ability to project the financial performance of the company being evaluated.

## COUNT I
### (Against All Defendants for Violation of Section 14(e) of the Exchange Act)

67.     Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

68.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. §78n(e).

69.     Defendants violated § 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the Tender Offer. Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

70.     The Recommendation Statement was prepared, reviewed, and/or disseminated by Defendants.   It misrepresented and/or omitted material facts, including material information about the consideration offered to shareholders via the Tender Offer and the intrinsic value of the Company.

71.     In doing so, Defendants made untrue statements and/or omitted material facts necessary to make the statements made not misleading.   Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e).   The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Recommendation Statement, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

72.     The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable shareholder would consider them important in deciding whether to tender their shares.   In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to shareholders.

73.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.   Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete

and therefore misleading.

74.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of her entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

## <u>COUNT II</u>
### (Against all Defendants for Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9, 17 C.F.R. § 240.14d-9)

75.     Plaintiff incorporates each and every allegation set forth as if fully set forth herein.

76.     Defendants have caused the Recommendation Statement to be issued with the intention of soliciting shareholder support of the Proposed Transaction.

77.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers.  Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

78.     SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof.

79.     In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's directors to:

> Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

80.    The omission of information from a recommendation statement will violate Section 14(d)(4) and Rule 14d-9 if other SEC regulations specifically require disclosure of the omitted information.

81.    The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, that render the Recommendation Statement misleadingly incomplete.  Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading.  Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

82.    The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of her right to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Tender Offer or taking any steps to consummate the Proposed Transaction, until the Company discloses the material information discussed above which has been omitted from the Recommendation Statement;

B.      Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff rescissory damages

C.      Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 21, 2019                        **MONTEVERDE & ASSOCIATES PC**

                                           By:  */s/ Juan E. Monteverde*
                                           Juan E. Monteverde (JM-8169)
                                           The Empire State Building
                                           350 Fifth Avenue, Suite 4405
                                           New York, NY 10118
                                           Tel: (212) 971-1341
                                           Fax: (212) 202-7880
                                           Email: jmonteverde@monteverdelaw.com

                                           *Attorneys for Plaintiff*

**OF COUNSEL:**

**ADEMI & O'REILLY, LLP**
Guri Ademi
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com

*Attorneys for Plaintiff*